No. 22,769.

THE STATE OF KANSAS, *Appellee,* v. DOC WARD (et al.), *Appellant.*

SYLLABUS BY THE COURT.

1. ROBBERY—*Sufficiency of Circumstantial Evidence.* Circumstantial evidence considered, and held sufficient to warrant the jury in finding that the defendant counseled, aided and abetted commission of the crime of robbery.

2. SAME—*Certain Evidence Properly Admitted.* Various portions of the evidence considered, and held they were properly admitted.

3. SAME—*Instruction as to Circumstantial Evidence.* The certainty required in order to warrant conviction on circumstantial evidence considered, and *held,* an instruction employing a mode of expressing such certainty different from that appearing in the case of *Carl Horne v. The State of Kansas,* 1 Kan. 42, was unobjectionable.

4. SAME—*No Meritorious Assignments of Error.* Minor assignments of error considered, and held to be without substantial merit.

Appeal from Kingman district court; GEORGE L. HAY, judge. Opinion filed October 9, 1920. Affirmed.

The State v. Ward.

*S. S. Alexander*, of Kingman, for the appellant.

*Richard J. Hopkins*, attorney-general, and *Clark A. Wallace*, county attorney, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The defendant was convicted of robbery as an accessory before the fact, and appeals.

At about 10:30 in the morning of Wednesday, October 29, 1919, three men alighted at the station at Rago, a village south of Kingman, in Kingman county, from a Santa Fe passenger train coming from the west. They were Carl Sheldon, Robert Roberts, and the defendant. At about 12:15 p. m. the three men took a northbound Santa Fe train for Hutchinson, a city in the county north of Kingman, which departed from the station at which the train from the west arrived. In the meantime the defendant went to the post office, ordered his mail forwarded to Hutchinson, returned to the station, purchased his ticket for Hutchinson, and loitered about waiting for the train. The station agent asked him if he knew Sheldon and Roberts, and he said he did not know them personally, but he thought their business was gambling.

Immediately on arrival at Rago, Sheldon and Roberts went west from the station about half a mile and then north about a quarter of a mile, to the house of a Mexican who was a section hand employed by the railroad company. The Mexican was away at work on his section. Sheldon and Roberts entered the house, bound the Mexican's wife and small child to chairs with ropes, took from the place where it was kept a sum of money amounting to $300, returned to the railroad station, and took the train for Hutchinson as stated.

That afternoon in Hutchinson the defendant purchased an automobile, and at about six o'clock in the evening arranged with Sheldon and Roberts to go to Enid, Okla. The price of the automobile was $225, of which the defendant paid $50 in cash. The next day the three men started for Enid in the automobile, avoiding the more direct route which would have taken them through Kingman and Rago. Four or five days after they arrived at Enid the defendant went to the post office, received a letter, read it, tore it up and threw it in a

trash can, and then went to his automobile standing nearby, where Sheldon and Roberts were waiting. A police officer appeared, arrested the three, and held them for the Kansas sheriff.

The information charged the three men jointly with robbery in the first degree. The defendant demanded a separate trial. Sheldon and Roberts were tried first, and were convicted. The evidence connecting the defendant with the crime was circumstantial, and he claims it was insufficient to sustain the verdict.

The three men were together in Hutchinson the week before the robbery. They left there on Friday, went to Kingman, then to Norwich, and arrived at Rago on Sunday. Sheldon and Roberts went on to Belvidere, but returned to Rago on Monday. On Tuesday night the three went to Nashville, ostensibly on a gambling trip, and returned to Rago on Wednesday morning, as stated. The defendant's brother, W. A. Ward, was the section foreman under whom the Mexican worked, and lived a block distant from the Mexican's house. The defendant stayed with his brother until he went to Nashville. On Monday evening W. A. Ward went to the Mexican's house to collect some money, which the Mexican paid. The Mexican took the money from the purse from which Sheldon and Roberts obtained the $300. On Tuesday the Mexican's wife saw Sheldon, Roberts and the defendant in front of W. A. Ward's house. They appeared to be in conversation, and pointed toward her house. Afterwards they passed by her house, and she saw their faces and was able to identify them. The week before the robbery W. A. Ward had obtained from a store some rope with which to tie a hog he was taking home to be butchered. There was evidence identifying the rope with that used to tie the Mexican woman and her child. The letter which the defendant received at Enid was written by his brother two or three days after the robbery occurred. The defendant testified the letter did not advise him he was suspected, but it might have said something about Sheldon and Roberts being suspected. The defendant said that when the three arrived at Rago from Nashville on the day of the robbery and Sheldon and Roberts immediately went west in the general direction of the Mexican's house, they told him they were going to the stockyards to get some cards they had buried there. Referring

to the trip to Nashville, a witness for the state, who saw the defendant waiting at the depot, testified he said to the defendant, "I understand you fellows were out there to have a game," and asked the defendant how they came out. The defendant replied they got eighteen dollars apiece. The defendant told the sheriff of Kingman county they went to Nashville for a game, but did not have it after they got there.

Sheldon and Roberts acted with such directness, certainty and speed that they necessarily possessed full and accurate knowledge of all the conditions with which they were to deal. Although strangers in the community and, according to the Wards, not near the scene of the crime while they were at Rago, they knew that a Mexican living on the outskirts of the village kept a sum of money in his house sufficiently large to make robbery worth while, knew where to find the money in the house, knew when the Mexican would be away from home, knew just what they would encounter, and were prepared to act accordingly. Apparently, proximity of the Mexican's house to W. A. Ward's house was not considered an element of danger. From what source did Sheldon and Roberts obtain their information? Manifestly from the defendant, who obtained it from his brother. As neighbor, employer and creditor of the Mexican, W. A. Ward knew much about him. Whether or not W. A. Ward went to the Mexican's house on Monday night to find out the size of the Mexican's roll of bills and where he kept it, he did find out. He testified he had never seen Sheldon and Roberts. The next day Sheldon, Roberts and the defendant were acting concertedly in front of W. A. Ward's house, and apparently with respect to the locality of the Mexican's house, and the unity of the group was not fully dissolved until the defendant demanded a separate trial. The trip to Nashville, the return, and the leaving for Hutchinson on the first train, were to afford an alibi in case the confederates were suspected. The defendant did not go to the Mexican's house because three men were not needed there, and because, being known at Rago, his careless presence about town would absorb attention and avert suspicion. It so happened, however, that a witness watched Sheldon and Roberts go west from the station as soon as they arrived from Nashville, a fact which, when disclosed, induced the defendant to invent the tale of cards

buried at the stockyards. The quick departure from Hutchinson, forty miles north of Rago, to a town in another state far south of Rago, by the conveyance and route chosen, was designed to baffle pursuit and afford opportunity to hear from Rago. Sheldon, Roberts and the automobile were all in waiting when the defendant came out of the post office at Enid with the letter; but an officer was waiting, too.

The foregoing presents in substance the state's theory of the case, which the jury evidently accepted. The only serious question was whether the defendant merely gave information to Sheldon and Roberts, or whether he was guilty of participation in commission of the crime. The defendant was a witness in his own behalf. He testified he had followed the harvest northward during the summer, and then had worked as a threshing hand during the fall, meeting Sheldon and Roberts at Hays. Doubtless the jury regarded the state's theory as fortified by the defendant's denial of acquaintance with his associates; by his failure to give any explanation of his intimate and continued relations with them; and by his failure to give any reason for going to Hutchinson and immediately leaving there, for his sudden need of an automobile and ability to buy one, for going to Enid, for idling about Enid with his two companions, and for some other features of his conduct. The whole case considered, the jury was justified in concluding the defendant counseled, aided and abetted commission of the robbery.

The defendant takes up the chain of evidence link by link— or better, the cable of evidence strand by strand—considers each part separately, and asserts it did not .reach the defendant, and concludes the evidence concerning it was improperly admitted. Collection of W. A. Ward's debt from the Mexican, the rope, purchase of the automobile, and gambling are among the subjects so treated. The fallacy of the defendant's method is apparent, and need not be discussed. The connection between W. A. Ward's visit to the Mexican's house and the robbery has been sufficiently indicated. Sheldon and Roberts provided themselves with a rope with which to tie the Mexican woman and her child. If the rope came from W. A. Ward's premises, the fact tended very strongly to implicate the defendant. Purchase of the automobile was pertinent, first as showing the

The State v. Ward.

defendant was in funds immediately after the robbery, and second as the conveyance used in the second stage of flight from the scene of the crime. The evidence relating to gambling was not offered to show the defendant was guilty of crimes other than the one charged, but to demonstrate his intimate relation with Sheldon and Roberts, who were gamblers.

The defendant complains particularly of the evidence relating to the letter and its contents. The rule that a defendant is not bound by statements in letters from third persons unless he has acted on them is cited. W. A. Ward testified he did not know his brother was suspected when he wrote the letter, and the contents of the letter were not divulged, except that the defendant testified it might have said Sheldon and Roberts were suspected, but it did not mention his name. Consequently, it cannot be said the defendant suffered any substantial prejudice as a result of inquiry respecting contents of the letter. However, the entire letter incident constituted a relevant circumstance, the importance of which was for the jury to judge. It was a fair inference that Enid was virtually a place of temporary refuge, and what to do next depended on advice from Rago. In due time the person who watched the progress of events at Rago mailed the letter. When it was received at Enid it was of such a character that the defendant did not care to keep it on his person, and he destroyed it, practically, if not actually, in the presence of the officer who arrested him.

Some complaint is made that proper evidence offered by the defendant was rejected, but it does not appear the evidence was produced at the hearing on the motion for a new trial, and the rulings are not reviewable.

The defendant requested an instruction relating to circumstantial evidence, based on the decision in the case of *Carl Horne v. The State of Kansas,* 1 Kan. 42, in which it was said:

"A few facts, or a multitude of facts proven, all consistent with the supposition of guilt. are not enough to warrant a verdict of guilty. In order to convict on circumstantial evidence, not only the circumstances must all concur to show that the prisoner committed the crime, but they must all be inconsistent with any other rational conclusion." (Syl. ¶ 2.)

In the present case the court directed the jury in substance that it was necessary for the state to establish guilt of the

defendant beyond reasonable doubt; that each fact necessary to the conclusion sought to be established should be proved by competent evidence beyond a reasonable doubt; that all facts necessary to the conclusion should be consistent with each other and with the main fact sought to be proved; and that the circumstances, taken together, should be of a conclusive character, leading to a satisfactory conclusion, to a reasonable and moral certainty, that the defendant was guilty.

The mode of expressing the certainty required in order to convict on circumstantial evidence was not unalterably fixed by the decision in the Horne case. Thus, in the case of *The State v. Adams*, 20 Kan. 311, instead of instructing as requested according to the formula of the Horne case, the court instructed the jury that the "circumstances must be such that [they] wholly satisfy the minds of the jurors that the fact not only may have existed, but necessarily must have existed from the facts proven." (p. 328.) This court approved the instruction given, saying a distinction between the two forms was not easily perceptible. The essence of the matter is that the proof as a whole must be inconsistent with any reasonable hypothesis of innocence, and this degree of assurance is attained if the proof of guilt be of a conclusive character, satisfying the mind to a reasonable and moral certainty.

The defendant requested the following instruction:

"You are instructed that it is the duty of every juror to reach the same verdict, and you cannot return your verdict into court until all twelve members of the jury agree upon the same verdict, which must be signed by your foreman."

Presumably the purpose was to call attention to the individual responsibility of each juror, but the instruction not only failed of its purpose, but misstated the law. Another requested instruction was that no juror should compromise his verdict in order to get out of the jury box or secure return of a verdict. Whatever may be said of the request, there is no claim that any such conduct occurred, and consequently no prejudice to substantial rights of the defendant appears. Instructions regarding the manner in which the jury should deal with specific items of evidence were properly refused. The law of the case was correctly and adequately stated in instructions which were given.

The judgment of the district court is affirmed.